IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

_____
                                    )
United States of America            )
                                    )
        v.                          )   Case No. 1:10mj453
                                    )
Jose Espinosa,                      )
                                    )
        Defendant.                  )
_____)

## MEMORANDUM OPINION AND ORDER

This case is before the court on defendant's motion to dismiss (no. 6). At issue is whether the United States government, consistent with the constitutional requirement of due process, may prosecute a military servicemember in a civilian court for a crime committed on a military installation when the servicemember (a) has already received "non-judicial punishment" pursuant to Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815 ("Article 15"); (b) has thereby waived his right to trial by court martial; (c) has not been told that he would be prosecuted in a civilian court anyway; and (d) could have foreclosed both non-judicial punishment and the civilian prosecution by asserting his right to a court-martial. While defendant argues several grounds for dismissal, the court grants the motion on the ground that under the circumstances presented here, this civilian

prosecution violates defendant's right to due process of law under the Fifth Amendment to the Constitution.

## I.

The court finds the following facts, which are stipulated or uncontested.

Defendant is a member of the United States Marine Corps who allegedly operated a motor vehicle while under the influence of alcohol within the boundaries of the Marine Corps Base at Quantico, Virginia. Defendant was therefore subject to, and had the right to, be tried by court-martial.

Pursuant to the procedures authorized under Article 15, defendant was taken before a superior officer and offered non-judicial punishment instead of a court-martial. Defendant accepted that offer, thereby waiving his right to demand trial by court-martial and receiving non-judicial punishment in exchange for his waiver. Defendant's agreement was memorialized in writing in a Unit Punishment Book entry. The entry is a pre-printed form on which the details of defendant's offense were entered and defendant indicated his decision to accept non-judicial punishment in exchange for waiving his right to a court-martial. The entry cautions that non-judicial punishment does not preclude further administrative action, but is silent as to the possibility of civilian prosecution. Nothing was said to defendant regarding the possibility of criminal prosecution in a civilian court, nor was the distinction between a court-martial under the Uniform Code of Military Justice and a civilian trial explained to or discussed with him.

As defendant's non-judicial punishment, defendant received a reduction in rank from Private First Class to Private, forfeited $1,622.00 in pay (suspended for six months), was restricted to base (as well as to certain movements within base) for 45 days, and was given two hours of extra duties per day for 45 days. Thereafter, the United States government, through a Special Assistant United States Attorney who is also a United States Marine Corps captain, filed the pending criminal information in this court against defendant, charging him with operating a motor vehicle while under the influence of alcohol and reckless driving.

## II.

This matter comes to the court in the context of the following legal framework.

Article 15 permits a commanding officer to impose disciplinary, or non-judicial, punishment upon a servicemember under the officer's command for "minor offenses" if the servicemember waives his right to a court-martial.[1] 10 U.S.C. § 815(b). The Manual for Courts-Martial, promulgated by the President pursuant to the authority granted by 10 U.S.C. § 836, defines a "minor offense" as "[o]rdinarily . . . an offense which the maximum sentence imposable would not include a dishonorable discharge or confinement for longer than 1 year if tried by general court-martial." 2008 MCM Part V ¶ 1e. The parties here agree that the offenses at issue are "minor offenses."

Under Article 15, a servicemember has the right to demand trial by court-martial instead of accepting disciplinary punishment. 10 U.S.C. § 815(a). If the servicemember

---

[1] Under some circumstances not relevant here, the servicemember has no right to demand a court-martial, e.g., when a "minor offense" occurs at sea. See 10 U.S.C. § 815(a).

has elected to receive disciplinary punishment rather than a trial by court-martial for the minor offense, the military may not prosecute the servicemember by court-martial. 2008 MCM Rule 907(b)(2)(D)(iv). This either-or condition of disciplinary punishment or trial by court-martial gives rise to the term "non-judicial punishment" to describe the former.

Congress made the last major changes to Article 15 in 1962, when it increased the authority of commanding officers to impose non-judicial punishment. The Senate Report accompanying the bill making those changes stated that the purpose of the bill was to "enable [commanding officers] to deal with minor disciplinary problems and offenses without resort to trial by court-martial." S. REP. NO. 87-1911, at 1-2, *reprinted in* 1962 U.S.C.C.A.N. 2379, 2380. The report went into further detail:

> The bill, by providing increased authority for nonjudicial punishment, will enable commanders to deal promptly and efficiently with problems of discipline. At the same time, the increased nonjudicial authority should permit the services to reduce substantially the number of court-martials [sic] for minor offenses, which result in stigmatizing and impairing the efficiency and morale of the person concerned.

S. REP. NO. 87-1911, at 1-3, *reprinted in* 1962 U.S.C.C.A.N. 2379, 2381-82. Thus, the objective of Article 15 is, in short, to increase the use of non-judicial punishment and, correspondingly, to reduce the number of courts-martial for minor offenses.

The Manual of the Judge Advocate General (the "JAG Manual") is promulgated pursuant to the Manual for Courts-Martial and governs the conduct of military prosecutions in the Department of the Navy, including the United States Marine Corps. JAG Manual § 101a, Prefatory Note 3. It states that non-judicial punishment "is designed for minor misconduct in a nonjudicial forum, without the permanent stigma of a record of

'Federal conviction.'" JAG Manual § 0110b. The JAG Manual also flatly prohibits the imposition of non-judicial punishment for "minor offense" conduct for which servicemembers have already been tried in United States District Courts. JAG Manual § 0124d. The clear intention of this provision is to prevent punishing servicemembers twice for the same conduct.

Finally, the Manual for Courts-Martial incorporates a 1985 Memorandum of Understanding between the Department of Justice and the Department of Defense (the "MOU"). *See* 2008 MCM Appx. 3. The MOU is intended to establish the working relationship and division of labor between the two departments as to the investigation and prosecution of crimes over which both departments have jurisdiction. 2008 MCM Appx. 3 ¶ A. The MOU states that the Department of Defense will investigate, and the military department concerned will prosecute by court-martial, crimes committed on military installations by individuals subject to the Uniform Code of Military Justice. 2008 MCM Appx. 3 ¶ C.2.a. The Department of Defense is not expected even to give notice to the Department of Justice unless the case is "significant" and the subject or victim is neither a servicemember nor a dependent of a servicemember. *Id*. Thus, the MOU contemplates that cases such as this one will be handled entirely through military channels, without the involvement of the Department of Justice.

The merits of either the stated policies that underlie the non-judicial punishment regime for minor offenses, or the formal arrangement between the Departments of Defense and Justice, are not for the court to determine. However, while these authorities

5

do not precisely address the situation at hand, they are relevant and important aspects of the situation into which this defendant was placed. They provide the underpinnings of a servicemember's expectation when he opts to accept non-judicial punishment for minor offenses—as discussed in Part IV, *infra*, the clear expectation that he will receive one form of punishment in lieu of another—and they are important to the due process analysis in which this court must now engage.

### III.

The unusual nature of the practice in issue[2] makes it difficult to analogize to other factual situations in the judicial precedents. The question whether due process prevents criminal prosecution of a servicemember who, like defendant, has committed a minor offense and accepted non-judicial punishment in exchange for waiving his right to a trial by court-martial appears to be one of first impression. The required result, however, is clear from basic due process analysis and is suggested by Fourth Circuit decisions applying the Due Process Clause in somewhat analogous situations. And, while the "*de facto* immunity" cases cited by defendant are not controlling here, they are consistent with the court's finding and support it.[3]

---

[2] The parties stipulated at oral argument that Marine Corps Base Quantico is the only Corps installation on the East Coast, including all Marine Corps installations within the Fourth Circuit, at which servicemembers who are subjected to non-judicial punishment for minor offenses are subsequently prosecuted in federal district court. It does appear, however, that the practice is not unique to this military installation. *See United States v. Trogden*, 476 F.Supp. 2d 564 (E.D. Va. 2007) (servicemember who accepted non-judicial punishment for driving under the influence of alcohol on the grounds of a Virginia Army base was subsequently prosecuted in civilian court).

[3] *See Call v. Polk*, 454 F.Supp. 2d 475 (W.D.N.C. 2006), *United States v. Jones*, 52 M.J. 60 (C.A.A.F. 1999), and defendant's brief (no. 6) at 6-7.

Due process analysis begins with the fact that "[t]he due process clause of the fifth amendment is a shield against unfair or deceptive treatment of an accused by the Government." *United States v. Romano*, 583 F.2d 1, 7 (1st Cir. 1978). Put another way, "the right to be treated fairly by the government is at the core of the due process clause." *Plaster v. United States* (*Plaster I*), 720 F.2d 340, 346 (4th Cir. 1983). In the oft-used phrase, criminal defendants are entitled to "fundamental fairness," a concept "whose meaning can be as opaque as its importance is lofty." *Lassiter v. Dep't. of Soc. Servs.*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed. 2d 640 (1981).

Neither the parties nor the court have found authority that precisely delineates the contours of fundamental fairness in the circumstances presented here, which is perhaps not surprising given the nature of the practice in issue. Defendant's acceptance of non-judicial punishment in lieu of trial by court-martial is akin, though, to the sort of immunity and plea agreements that are routinely reached by prosecutors and defendants in this court. *See Flowers v. United States*, 80 Fed. Cl. 201, 204 (Fed. Cl. 2008) (accused signed "plea bargain agreement" whereby he accepted non-judicial punishment in lieu of trial by court-martial). In the circumstances surrounding both prosecutor-defendant agreements and non-judicial punishment agreements, the accused waives a right—here the right to trial by court-martial—in exchange for a lesser punishment than he might otherwise receive. Moreover, the fundamental due process principles governing plea agreements and non-judicial punishment agreements are similar. *Compare McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed. 2d 418 (1969) ("[I]f a

7

defendant's guilty plea is not . . . voluntary and knowing, it has been obtained in violation of due process and is therefore void.") *with Fairchild v. Lehman*, 814 F.2d 1555, 1558-59 (Fed. Cir. 1987) (choice between non-judicial punishment and court-martial "involve[s] due process considerations" requiring that the accused possess "the requisite quantum of information necessary for an informed decision").

It is therefore appropriate to examine this case through the lens of decisions examining the due process principles that govern prosecutor-defendant agreements. The Fourth Circuit has applied the Due Process Clause of the Fifth Amendment in at least two situations that support the court's finding that this prosecution is fundamentally unfair.

### A.

*United States v. Harvey*, 791 F.2d 294 (4th Cir. 1986) is the first decision that provides guidance here. The defendant in *Harvey* was indicted in the Eastern District of Virginia on charges related to a drug distribution conspiracy. 791 F.2d at 295. He ultimately accepted a plea bargain memorialized in a written agreement, which stated that "[t]he Eastern District of Virginia" agreed not to prosecute him on eight counts of the indictment in exchange for his guilty plea to one count. *Id.* at 296 n.1. After the defendant's release from prison, he was indicted in the District of South Carolina on charges related to the same conspiracy. *Id.* at 297. He sought an order enjoining prosecution on the ground that it was barred by his prior plea agreement. *Id.* The district court denied the motion, finding that the plea agreement unambiguously promised only that the Eastern District of Virginia would not prosecute, and noting that the prosecutor

making the offer neither represented that she was authorized to bind other districts to a promise not to prosecute, nor explicitly stated that she did not have such authority. *Id.* at 297-99. The defendant appealed to the Fourth Circuit. *Id.* at 299.

The Fourth Circuit began with the proposition that the interpretation of plea agreements rests on principles of contract law, but with two significant differences. 791 F.2d at 300. First, the interpretation of plea agreements reflects different, more expansive concerns than the interpretation of commercial contracts, as they implicate a defendant's constitutional rights. *Id.* (citing *Mabry v. Johnson*, 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed. 2d 437 (1984)). Second, courts' concerns in the interpretation of plea agreements in federal prosecutions are "even wider than protection of the defendant's individual constitutional rights," involving "concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Id.* (quoting *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972)). The court held that these concerns "require holding the Government to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements[,]" particularly where the government has prepared a written agreement. *Id.* at 300-01 (internal citations omitted). This was so even when derelictions by defense counsel contributed to any ambiguity because "the validity of a bargained guilty plea depends finally upon the voluntariness and intelligence with which the defendant—and not his counsel—enters the guilty plea." *Id.* at 301 (citing *Mabry*, 467 U.S. at 509).

Applying those principles, the Fourth Circuit disagreed with the government's contention that the agreement stated only that the Eastern District of Virginia would not prosecute the defendant, holding that the agreement's reference to the "Eastern District of Virginia" was "only to the entity which is making the agreement on the Government's side . . . ." 791 F.2d at 301. The court found that the government easily could have worded the agreement such that it was clear that it prevented only prosecution in or by the Eastern District of Virginia, and that the failure to do so was evidence of ambiguity. *Id.* at 301.

Looking at the language of the writing itself, the court found intrinsic evidence that it was plausible to read the agreement as binding the entire government, not just the Eastern District of Virginia. 791 F.2d at 301-02. The court pointed to provisions stating that the "Government" would move to dismiss and that the "Government" would not oppose a continuation of bond pending sentencing. *Id.* The court then found extrinsic evidence of the plausibility of that interpretation, pointing to evidence that the defendant and his attorney both unequivocally represented their firm belief to the court at sentencing that the plea agreement ended the defendant's exposure to prosecution on related charges. *Id.* at 302. The court also pointed to "settled plea bargaining law of this circuit[:]"

> [T]hough the Government negotiates its plea agreements through the agency of specific United States Attorneys—as necessarily it must—the agreements reached are those of the Government. It is the Government at large—not just specific United States Attorneys or United States "*Districts*"—that is bound by plea agreements negotiated by agents of Government. Whenever a United States Attorney negotiates and enters a plea agreement, it is the Government that "agrees" to whatever is agreed to.

10

*Id.* at 302-03.

The Fourth Circuit therefore held that the writing memorializing the agreement was ambiguous and must be read against the government. 791 F.2d at 303. Because it was plausible to read the agreement as binding on the government as a whole, the court concluded that the government could not further prosecute the defendant for the offenses described in the plea agreement. *Id.*

**B.**

The second source of guiding principles is a pair of decisions in the same case, *Plaster v. United States* (*Plaster I*), 720 F.2d 340 (4th Cir. 1983) and *Plaster v. United States* (*Plaster II*), 789 F.2d 289 (4th Cir. 1986). In *Plaster*, United States Army officials negotiated a grant of immunity from American and West German prosecution to a former servicemember in exchange for his testimony against a co-defendant as to a murder that had occurred in West Germany. *Plaster I*, 720 F.2d at 344-45. The servicemember signed the immunity agreement and mailed it back to the Army, at which point it was lost. *Id.* at 345. Higher command concluded from the absence of the agreement that the servicemember had been unwilling to cooperate, but decided not to pursue the matter further as the servicemember and his co-defendant were already serving prison sentences in connection with another crime. *Id.*

Fifteen years later, the United States Attorney's office sought certification in a District Court of the servicemember's extraditability so that he could be extradited to West Germany to face prosecution for the murder there. 720 F.2d at 345-46. The District

Court barred the extradition, and the government appealed. *Id.* at 346. On appeal, the Fourth Circuit rejected the government's contention that the immunity agreement was unenforceable for lack of consideration because the servicemember never performed his obligation by incriminating himself. *Id.* at 352-53. The court noted first that the decision to proceed by an executory immunity agreement was the government's, not the servicemember's. *Id.* at 353. Second, the court held that the exigencies of the military context required that a military official have the authority to promise immunity to prospective witnesses, and that such promises could only be effective if binding. *Id.* Finally, the court emphasized that fundamental fairness required consideration of the passage of time between the agreement and the government's attempted withdrawal. *Id.* The servicemember had believed for fifteen years that he had put the murder case behind him by agreeing to testify, and that reasonable belief would render invalidation of the agreement for lack of consideration fundamentally unfair. *Id.* at 353-54.

The court thus determined that there was an enforceable promise by the government not to extradite the servicemember, but it further held that the extradition power must be reserved to the President's discretion because it implicates issues of foreign affairs. 720 F.2d at 354. The court therefore remanded the case for a factual determination whether military officials had been given an "articulable indication" of authority to promise non-extradition. *Id.* at 354-55. When the case returned to the Fourth Circuit, the court held that such authority did in fact exist, on the ground that the Departments of State and Defense had decided not to return the servicemember to West

German jurisdiction and had communicated that decision to the military official who authorized the immunity offer. *Plaster II*, 789 F.2d at 291-92.

The court rejected a government argument that authority to promise non-extradition was lacking because the Departments of State and Defense had decided only that the government would not accede to an assertion of jurisdiction of prosecution by the West German government under the then-existing status of forces agreement. 789 F.2d at 291-92. The government argued that the decision was not to refuse to enforce an *extradition* request by the West German government; indeed, there was no extradition treaty between the countries at the time of the immunity agreement. *Id.* The court held that because there existed a mechanism by which the servicemember could be returned to West Germany to stand trial at the time the parties entered the immunity agreement, any technical distinction between a status of forces agreement and an extradition treaty was irrelevant. *Id.* at 292. The servicemember had a vested due process right not to be returned to West Germany to stand trial, and whether or not the word "extradition" was ever used was "a mere matter of semantics." *Id.*

## C.

The overarching principle that emerges from these two cases is that the Due Process Clause forbids the government from inducing a defendant to give up rights—the right to a trial in *Harvey* and the right against self-incrimination in *Plaster*—and then pulling the rug out from under him. Fundamental fairness requires that a defendant's decision to waive rights be voluntary and informed. If the government creates an

expectation as to its end of the bargain and then acts contrary that expectation, a defendant's waiver is no longer voluntary and informed. As in *Harvey*, the government cannot through its silence reserve to itself the ability to take action contrary to a defendant's reasonable understanding of his plea agreement. As in *Plaster*, the government cannot rely on a semantic distinction to persuade a defendant to waive rights in exchange for something other than what he believed in good faith he was bargaining for. This kind of deceptive behavior lies well beyond the bounds of due process.

**IV.**

The actions of the government here are similarly unconstitutional. The government's end of the non-judicial punishment agreement is rooted in Article 15, the JAG Manual, and the MOU. The regime created by those authorities contemplates that a servicemember who agrees to waive his right to trial by court-martial and accept non-judicial punishment is foreclosing further prosecution. Indeed, the regime would not be rational otherwise.

Under the regime created by the government, defendant was entitled to a trial by court-martial, which would have precluded a civilian trial. *See Wilkes v. Dinsman*, 48 U.S. (7 How.) 89, 123, 12 L.Ed. 618 (1849) (proceedings before a court-martial are "a bar to subsequent indictments in courts of common law for the same offense") (internal citations omitted); *see also Kepner v. United States*, 195 U.S. 100, 128, 24 S.Ct. 797, 49 L.Ed. 114 (1904) ("[A] person has been in jeopardy when he is regularly charged with a crime before a tribunal properly organized and competent to try him . . . .") (citing

14

*Coleman v. Tenn.*, 97 U.S. (7 Otto) 509, 24 L.Ed. 1118 (1878)). In order to persuade defendant to waive that right and save the Department of Defense the inconvenience of a court-martial, a superior officer offered him an apparently attractive choice of non-judicial punishment instead of court-martial without explaining the possibility, much less the government's intent, that defendant would also be subjected to trial and punishment in civilian court. Defendant was *promised* discipline *instead of* prosecution. Defendant *received* prosecution *in addition to* discipline.

In essence, if subsequent criminal prosecution after non-judicial punishment were permitted, the question presented to an accused servicemember would be whether he wishes to receive two punishments—non-judicial punishment followed by criminal prosecution—or one—trial by court-martial. No rational individual would choose non-judicial punishment *plus* prosecution over prosecution alone. It would thus defy logic for a servicemember to believe that the government could, much less would, prosecute him in civilian court after he accepted non-judicial punishment.

Simply put, the government has tricked defendant into a choice that no rational, fully-informed person could be expected to make. The government has engaged in a calculated bait-and-switch scheme that is constitutionally unacceptable. Judicial condonation of that bait-and-switch would not promote the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *Harvey*, *supra*, at 300. The court finds that

15

the present prosecution is fundamentally unfair and is barred by the Due Process Clause of the Fifth Amendment.

V.

Finally, the government makes two arguments that have not yet been addressed. First, the government argues that civilian prosecution of cases like this is important to vindicate public safety, as a conviction ensures that drunk drivers receive notations on their driving records and that the Department of Motor Vehicles takes appropriate action. The simple answer is that the government could elect to prosecute all such cases by court-martial, reporting guilty adjudications to the state agency as does this court; or the government could remove drunk driving offenses from the scope of Article 15, by MOU or otherwise, and prosecute them all in civilian court. In any event, the government's stated concern does not address the fundamental unfairness of the situation it has created.

Second, the government argues that these cases are resolved under *United States v. Trogden*, 476 F.Supp. 2d 564 (E.D. Va. 2007). In *Trogden*, however, the court expressly considered only whether the Double Jeopardy Clause barred criminal prosecution after non-judicial punishment, and neither the *pro se* defendant nor the government raised any other issue. *See* 476 F.Supp. 2d at 566. The issue here is whether the Due Process Clause, not the Double Jeopardy Clause, bars such government action. *Trogden* is therefore inapplicable.

For these reasons it is ORDERED that defendant's motion to dismiss (no. 6) is GRANTED and this case is DISMISSED.

/s/
Thomas Rawles Jones, Jr.
United States Magistrate Judge

December 2, 2010
Alexandria, Virginia